## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOE J. ABRAMOWICH, JR., JAMES F. CHEEK, GEORGE FRIEDLINE, RALPH E. HOUGH, HAROLD R. LEONARD, JIM B. MANGES, TERRY W. MARCHEWKA, PAT RUCK, FRANKLIN RANDALL SHELKEY, MARK R. WARD, and NATHAN WESTFALL, | )<br>)<br>)<br>)<br>)<br>)<br>)  CIVIL ACTION NO. 3:11-109 |
| Plaintiffs, | )  JUDGE KIM R. GIBSON |
| v. | ) |
| CSX TRANSPORTATION, INC., BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN, and THE BROTHERHOOD OF LOCOMOTIVE ENGINEERS AND TRAINMEN, GENERAL COMMITTEE OF ADJUSTMENT CSX TRANSPORTATION NORTHERN LINES, | )<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER OF COURT

**GIBSON, J.**

### I.    SYNOPSIS

This matter is before the Court on the parties' cross-motions for summary judgment, filed pursuant to Federal Rule of Civil Procedure 56. For the reasons that follow, Plaintiffs' Motion for Summary Judgment (Doc. No. 57) is **DENIED**, Defendant CSX Transportation, Inc.'s Motion for Summary Judgment (Doc. No. 62) is **GRANTED**, Defendant Brotherhood of Locomotive Engineers and Trainmen's Motion for Summary Judgment (Doc. No. 61) is **GRANTED**, and Defendant Brotherhood of Locomotive Engineers and Trainmen, General Committee of Adjustment's Motion for Summary Judgment (Doc. No. 56) is **GRANTED**.

## II.    JURISDICTION AND VENUE

The Court has jurisdiction pursuant to 28 U.S.C. § 1337.    Venue is proper under 29 U.S.C. § 185 (a) and (c).

## III.    BACKGROUND

This case stems from a dispute over an amount of back pay allegedly owed to the Plaintiffs. (See Doc. No. 39).  Plaintiffs allege that Defendant CSX Transportation ("CSXT") breached the applicable collective bargaining agreement and that Defendants Brotherhood of Locomotive Engineers and Trainmen ("BLET") and Brotherhood of Locomotive Engineers and Trainmen, General Committee of Adjustment CSX Transportation Northern Lines ("GCA") breached their duty of fair representation. (See Doc. No. 39).  According to the Plaintiffs, CSXT wrongly withheld back pay in violation of the collective bargaining agreement, and BLET and GCA executed a settlement agreement with CSXT resolving Plaintiffs' back pay claims that was arbitrary, discriminatory, or made in bad faith. (See Doc. No. 39 ¶¶ 45-52).

Plaintiffs filed a Complaint (Doc. No. 1) on May 2, 2011 and an Amended Complaint (Doc. No. 39) on May 17, 2012.  Defendant CSXT filed its Answer (Doc. No. 38) on June 12, 2012;[1] Defendant BLET filed its Answer (Doc. No. 42) on June 12, 2012; and Defendant GCA filed its Answer (Doc. No. 50) on July 9, 2012.  Thereafter, the parties conducted discovery.

On January 18, 2013, Defendant GCA filed a motion for summary judgment (Doc. No. 56), a brief in support (Doc. No. 64), and a concise statement of material facts (Doc. No. 63).  On January 18, 2013, Plaintiffs filed a motion for summary judgment (Doc. No. 57), a brief in support (Doc. No. 59), a concise statement of material facts (Doc. No. 58), and an appendix of

---

[1] On June 12, 2012, the Court entered an Order (Doc. No. 41) granting BLET's motion (Doc. No. 40) for leave to file its Answer to the Amended Complaint out of time.  The Order stated that BLET's Answer (Doc. No. 38) would be deemed filed as of the date of the Order—June 12, 2012. (See Doc. No. 41).

supporting exhibits (Doc. No. 60), as required by the Local Rules of the U.S. District Court for the Western District of Pennsylvania (the "Local Rules"). On January 18, 2013, Defendant BLET filed a motion for summary judgment (Doc. No. 61), a brief in support (Doc. No. 68), and a concise statement of material facts (Doc. No. 70). On January 18, 2013, Defendant CSXT filed a motion for summary judgment (Doc. No. 62), a brief in support (Doc. No. 66), and a concise statement of material facts (Doc. No. 65). In accordance with Local Rule 56(B)(3), Defendants CSXT, BLET, and GCA jointly filed an appendix of supporting exhibits (Doc. No. 67) for their respective motions for summary judgment on January 18, 2013.

Plaintiffs filed a brief in opposition to each Defendant's motion (Doc. Nos. 72, 74, 77) and responsive CSMFs (Doc. Nos. 71, 73, 75). Defendant CSXT filed a brief in opposition to Plaintiffs' motion on February 19, 2013 (Doc. No. 76), responsive CSMF on February 19, 2013 (Doc. No. 78), a reply brief on March 19, 2013 (Doc. No. 86), and a counterstatement of material facts on March 19, 2013 (Doc. No. 87). Defendant BLET filed a brief in opposition to Plaintiffs' motion on February 19, 2013 (Doc. No. 79), responsive CSMF on February 19, 2013 (Doc. No. 80), a reply brief on March 19, 2013 (Doc. No. 88), and a counterstatement of material facts on March 19, 2013 (Doc. No. 89). Defendant GCA filed a brief in opposition to Plaintiffs' motion on February 19, 2013 (Doc. No. 83), responsive CSMF on February 19, 2013 (Doc. No. 82), a reply brief on March 19, 2013 (Doc. No. 84), and a counterstatement of material facts on March 19, 2013 (Doc. No. 85).

The relevant facts are as follows.[2] CSXT operates a railroad system in the Eastern United States. (Doc. No. 65 at ¶ 1; Doc. No. 71 at ¶ 1). Plaintiffs are current or former CSXT

_____

[2] The parties have filed extensive statements of material facts—each party filed a concise statement of material facts ("CSMF") (Doc. Nos. 58, 63, 65, 70); Plaintiffs filed a responsive CSMF to each Defendant (Doc. Nos. 71, 73, 75); each Defendant filed a responsive CSMF to the Plaintiffs (Doc. Nos. 78, 80, 82); and each Defendant filed a counterstatement of facts (Doc. Nos. 84, 87, 89). Not every fact contained in the parties' extensive statements is

employees who worked as locomotive engineers in "helper" service assignments.[3] (Doc. No. 65 at ¶ 2; Doc. No. 71 at ¶ 2). BLET is a national labor organization. (Doc. No. 39 at ¶ 17). GCA is a labor organization that negotiates and administers the collective bargaining agreements with CSXT that apply to the Plaintiffs.[4] (Doc. No. 39 at ¶ 19; Doc. No. 50 at ¶¶ 17, 19; Doc. No. 70 at 4).

During the time relevant to the helper pay dispute, the General Chairman of GCA was Richard Finamore ("Finamore"), and the Vice General Chairman of GCA was Dan Knorek ("Knorek"). (Doc. No. 63 at ¶ 4; Doc. No. 75 at ¶ 4). The duties of the GCA include settling complaints, claims, and grievances that arise from disputes between the management and the union's members. (Doc. No. 63 at ¶ 4; Doc. No. 75 at ¶ 4). Finamore, as General Chairman, delegated the responsibility of handling members' claims to Knorek, the Vice General Chairman. (Doc. No. 67-2 at 14). Accordingly, Finamore put Knorek in charge of handling the helper pay dispute. (Doc. No. 67-2 at 16).

Plaintiffs were members of Local Division 50, a local union within the GCA's territory. (Doc. No. 63 at ¶ 5; Doc. No. 75 at ¶ 5). Ted Doorley ("Doorley") was the local chairman for Local Division 50 and was responsible for handling employees' grievances at the local level.[5] (Doc. No. 63 at ¶ 5; Doc. No. 75 at ¶ 5; Doc. No. ¶ 26).

---

undisputed; neither is every fact material. The Court has included only the material, undisputed facts necessary for the disposition of the instant motions for summary judgment. Furthermore, the Court has construed, where appropriate, the facts in the light most favorable to Plaintiffs.

[3] Locomotive engineers working in "helper" service operate locomotives that are used to assist heavy trains travel up a grade. (See Doc. No. 65 at ¶ 2).

[4] Plaintiffs contend that BLET and GCA are one entity for the purposes of this action. While the Court finds that the Defendants' arguments and evidence showing that BLET and GCA are separate entities are more compelling than the Plaintiffs' arguments and evidence, the Court will consider BLET and GCA as one entity—"the union"—for the disposition of the motions pending before the Court.

[5] Ralph Baumann later replaced Doorley as the local chairman for Division 50. (Dos. Nos. 60-11 at 12; 67-2 at 30).

CSXT and GCA negotiated a collective bargaining agreement, the CSXT-BLET Single System Agreement ("Single System Agreement" or "SSA"),[6] which became effective on April 25, 2007. (Doc. No. 65 at ¶ 5; Doc. No. 71 at ¶ 5). The collective bargaining agreement establishes the rate of pay for locomotive engineers, which varies depending on the type of service that an engineer is working. (Doc. No. 65 at ¶ 6; Doc. No. 71 at ¶ 6). The instant dispute involves the proper calculation of pay for engineers working in helper service under the Single System Agreement ("helper pay dispute"). (Doc. No. 65 at ¶ 6; Doc. No. 71 at ¶ 6).

Locomotive engineers operating trains between terminals are paid at a rate based on a certain minimum number of miles per day. (Doc. No. 63 at ¶ 7; Doc. No. 75 at ¶ 7). If an engineer operates a train in excess of those miles, he is entitled to a higher rate of pay. (Doc. No. 63 at ¶ 4; Doc. No. 75 at ¶ 4). Pursuant to the collective bargaining agreement applicable to Plaintiffs prior to the SSA, engineers working in helper service were paid at a 100-mile basic day rate. (Doc. No. 65 at ¶ 6; Doc. No. 71 at ¶ 6). Article 67.C of the Single System Agreement, the collective bargaining agreement applicable to the instant dispute, sets forth the rate of pay for locomotive engineers working in helper service as follows:

> At points other than the Division Home Terminal, the basic day mileage for engineers working helper/pusher assignments will be one hundred (100) miles with assignments guaranteed minimum employment or pay to one hundred twenty-five (125) straight time miles five (5) days per week as stipulated in the job advertisement, to be paid at Engineer's yard rate of pay for all miles of their assignment (worked or advertised) applicable to weight on drivers with overtime to commence after eight (8) hours on duty. In the event arrangements are made for a helper/pusher to work a six (6) or seven (7) day work week, the guarantee above will be adjusted by 125 miles per day.

---

[6] The parties also identify the Single System Agreement as "CSXT Labor Agreement No. 1-023-07, effective April 25, 2007, as modified by CSXT Labor Agreement No. 1-030-09, effective September 15, 2009." (See Doc. No. 58 ¶ 2; Doc. No. 78 ¶ 2, Doc. No. 80 ¶ 2, Doc. No. 82, ¶ 2). CSXT and GCA negotiated the SSA to replace collective bargaining agreements that had governed multiple predecessor railroads that had been merged into CSXT over the years, including the Louisville and Nashville Railroad ("L&N") and the Baltimore and Ohio Railroad ("B&O"). (See Doc. No. 65 at ¶ 5; Doc. No. 71 at ¶ 5).

(Doc. No. 65 at ¶ 7; Doc. No. 71 at ¶ 7; Doc. No. 80 ¶ 3; Doc. No. 82, ¶ 3). At all times relevant to the helper pay dispute, CSXT and Plaintiffs were bound and governed by the terms and conditions of the Single System Agreement. (Doc. No. 58 ¶ 2; Doc. No. 78 ¶ 2, Doc. No. 80 ¶ 2, Doc. No. 82, ¶ 2).

When the Plaintiffs received their first paychecks under the SSA in May 2007,[7] they discovered that CSXT was not paying them at the rate that they believed was set forth in Article 67.C of the SSA. (See Doc. No. 58 at 4). Within sixty days after receiving their first paychecks and realizing that CSXT was compensating them at the lower rate, Plaintiffs notified their union representatives of the pay rate problem. (See Doc. No. 58 at ¶ 4).[8] Plaintiffs did not file any formal claims with CSXT concerning the helper pay issue. (See Doc. No. 58 at ¶¶ 5-6).

In December 2008, Knorek notified CSXT of the helper pay issue when he raised the discrepancy as a payroll issue with Rick Hiel, CSXT Director of Labor Relations ("Hiel"). (Doc. No. 78 at ¶ 6; Doc. No. 58 at ¶ 6). CSXT initially believed the helper pay issue was "a payroll error to be investigated and corrected." (Doc. No. 78 at ¶ 6; Doc. No. 58 at ¶ 6). From

---

[7] Plaintiffs claim they realized that CSXT was compensating them at the lower rate of pay after receiving their first paychecks following the implementation of the SSA on April 25, 2007. While Plaintiffs have not produced any documentation to verify the date on which they received their first paycheck under the SSA, according to deposition testimony, CSXT issued the first paychecks under the SSA sometime in May 2007. (See, e.g., Doc. No. 67-2 at 12).

[8] Plaintiffs assert that they "informed the duly authorized bargaining agents and representatives of BLET"—including Finamore, Knorek, and Doorley—about the helper pay issue within 60 days after receiving their first paychecks. (See Doc. No. 58 at ¶ 4). While the Plaintiffs cite the depositions of Plaintiff Cheek and Plaintiff Ward to substantiate this assertion, the cited deposition testimony shows only that the Plaintiffs discussed the issue with Doorley, not with Finamore or Knorek. (Doc. 60-10 at 7; Doc. No. 60-11 at 5). Furthermore, Plaintiff Ward stated in his deposition that he did not engage in any conversation or correspondence concerning the helper pay issue with Finamore, Knorek, or anybody else from BLET or GCA between the 2007 effective date of the SSA and the date of the 2010 settlement agreement. (See Doc. No. 60-11 at 7-8).

Defendant GCA, on the other hand, contends that Plaintiffs did not notify GCA about the helper pay issue until sometime in late 2008. (See Doc. No. 82 at ¶ 5). Finamore stated that he learned about the helper pay issue in December 2008. (Doc. No. 67-2 at 46-47). Knorek stated that he learned about the helper pay issue in September or October 2008. (Doc. No. 67-3 at 28-30).

Nevertheless, while the Plaintiffs' proffered evidence is unconvincing and is controverted by the GCA's evidence, the Court, construing the evidence in the light most favorable to the Plaintiffs, will accept Plaintiffs' assertion as true for the sole purpose of deciding the instant motions. Accordingly, the Court will accept as true the fact that Plaintiffs notified the appropriate local union representatives, as well as representatives for BLET and GCA, about the helper pay issue within 60 days after receiving their first paycheck in May 2007.

December 2008, until the parties finally settled the matter in November 2010, CSXT and GCA discussed the helper pay issue at numerous meetings and through various correspondences. (Doc. Nos. 78 ¶ 6; 58 at ¶ 6; 63 at ¶¶ 11-22; 75 at ¶¶ 11-22).

On May 11, 2009, Knorek emailed Hiel regarding the helper pay issue. (Doc. No. 60-4). In his email, Knorek provided information—which CSXT had requested at a meeting on April 24, 2009—related to the helper pay issue, including the proper rate of pay, an audit that was to be completed dating back to the implementation of the SSA, and the application of Article 67. (Doc. No. 60-4 at 2). On May 11, 2009, Hiel responded to Knorek and Finamore via email stating "[I]f you have an Engineer with specific information relative to an error in his pay . . . it will be investigated when you have provided the information to Payroll. If an error is discovered, the discrepancy will be corrected going forward and any adjustments will be limited to the preceding 60 days." (Doc. 60-4 at 1). Finamore replied to Hiel's email on the following day:

> As you know this office has had meeting after meeting with payroll representatives over this issue as well as discussed at the DRC as it applies to Article 67. GC Moates has also raised the issue the Helpers are not being paid correctly. Your below reply is totally unacceptable.

(Doc. No. 60-4 at 1). Thereafter, CSXT and GCA continued to investigate and discuss the helper pay issue. (Doc. Nos. 58 at ¶ 6; 78 at ¶ 6; 80 at ¶ 6; 82 at ¶ 6).

On January 11, 2010, Knorek sent an email to Terry Byers ("Byers"), a Director of Labor Relations for CSXT, asking Byers about the status of the helper pay issue. (Doc. No. 60-1). Byers responded to Knorek's inquiry on the same day ("Byers' email"), indicating that he had determined a way to resolve the helper pay issue. (Doc. No. 60-1). Byers stated that two issues needed to be corrected in order to resolve the pay rate problem. (*Id.*). First, CSXT would need to change a profile designation in the payroll system. (*Id.*). Second, the locomotive engineers

working helper service would need to claim the 125-mile rate rather than the 100-mile rate for the applicable duty locations. (*Id.*). Byers further noted that CSXT would "go back and adjust the shortages, but this will take some time to do." (*Id.*).

In April 2010, CSXT began to pay Plaintiffs for helper service at the higher rate of 125 miles per day in accordance with SSA Article 67.C. (Doc. No. 39 at ¶ 34; Doc. No. 38 at ¶ 34; Doc. No. 67-5 at 6).

Thereafter, Sam Macedonio ("Macedonio"), CSXT Director of Labor Relations, learned about the helper pay dispute when he became CSXT's Highest Designated Officer ("CSXT HDO") sometime in 2010.[9] (Doc. Nos. 67-4 at 40, 67-5 at 17). Sometime between June and August 2010, Macedonio reviewed the Byers' email and concluded that Byers did not have the authorization to make the payroll changes indicated in the email. (Doc. No. 67-4 at 45-46). Macedonio also reviewed the SSA and concluded that the proper rate of pay for Plaintiffs working in helper service was the lower rate of 100 miles per day rather than the higher rate of 125 miles per day under Article 67.C. (Doc. No. 67-5 at 12-16). Macedonio determined that CSXT did not owe Plaintiffs the amount of back pay claimed and was prepared to arbitrate the dispute in accordance with his interpretation of the SSA. (Doc. No. 67-5 at 20-22).

After further correspondences and negotiations concerning the helper pay issue, GCA and CSXT entered a settlement agreement on November 5, 2010 ("settlement agreement").[10] (See Doc. No. 67 at 14). The settlement agreement provided in relevant part:

> [C]oncerning the back pay for the Rowlesburg and Connellsville helpers. Based on the unique circumstances surrounding this issue, the following is agreed:

---

[9] As CSXT's HDO, Macedonio was responsible for interpreting the collective bargaining agreement and challenging the meaning of disputed language in the contract. (See Doc. No. 67-5 at 17).

[10] Finamore signed the settlement agreement for GCA. Macedonio signed the settlement agreement for CSXT. (See Doc. 67 at 14; Doc. No. 39 at ¶ 36; Doc. No. 42 at ¶ 36).

8

1. The affected employees . . . will be paid in the amount specified, for a total payment of $134,096.98.
2. This payment is in full and final settlement of all claims up to the date of this agreement.
3. This payment is being made without prejudice to either party's position regarding what constitutes a Division Home Terminal.

(Doc. No. 60-2).

Dissatisfied with the amount of back pay paid under the settlement agreement, Plaintiffs Jim B. Manges and Mark R. Ward attempted to appeal the settlement agreement internally through the union. (Doc. Nos. 39 at 44; 42 at 44; 60-11 at 9-10; 69 at 45-67). BLET National Division President, Dennis Pierce, ("Pierce") responded to the Manges and Ward appeals in a letter dated January 19, 2011, stating that Finamore had full and complete authority to enter into the settlement agreement. (Doc. Nos. 69; 39 at 44; 42 at 44).

Thereafter, Plaintiffs commenced the instant action by filing a Complaint on May 2, 2011. Plaintiffs assert that they are entitled to back pay for the period from April 2007 to April 2010. This matter is now ripe for adjudication.

## IV.    LEGAL STANDARDS

### A.    Summary Judgment

"Summary judgment is appropriate only where . . . there is no genuine issue as to any material fact . . . and the moving party is entitled to judgment as a matter of law." *Melrose, Inc. v. Pittsburgh*, 613 F.3d 380, 387 (3d Cir. 2010) (quoting *Ruehl v. Viacom, Inc.*, 500 F.3d 375, 380 n.6 (3d Cir. 2007)); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a).[11] Issues of fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986);

---

[11] Rule 56 was revised in 2010. The standard previously set forth in subsection (c) is now codified as subsection (a). The language of this subsection is unchanged, except for "one word—genuine 'issue' bec[ame] genuine 'dispute.'" Fed. R. Civ. P. 56 advisory committee's note, 2010 amendment.

see also *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Material facts are those that will affect the outcome of the trial under governing law. *Anderson*, 477 U.S. at 248. The Court's role is "not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009). "In making this determination, 'a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor.'" *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000) (quoting *Armbruster v. Unisys Corp*, 32 F.3d 768, 777 (3d Cir. 1994).

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets this burden, the party opposing summary judgment "may not rest upon the mere allegations or denials" of the pleading, but "must set forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 n.11 (1986)). "For an issue to be genuine, the nonmovant needs to supply more than a scintilla of evidence in support of its position—there must be sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant." *Coolspring Stone Supply v. Am. States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir. 1993).

## B. The Hybrid Claim

Under the Railway Labor Act, 45 U.S.C. § 151 *et seq.*, a plaintiff can assert a hybrid claim against both his union for breaching its duty of fair representation and his employer for breaching its duties under the collective bargaining agreement. *West v. Conrail,* 481 U.S. 35, 36

10

(1987); *Russo v. Am. Airlines, Inc.*, 340 F. App'x 816, 818 (3d Cir. 2009). In order to prevail on a hybrid claim, a plaintiff must prove (1) that the employer breached the collective bargaining agreement and (2) that the union breached its duty of fair representation. *Vaca v. Sipes,* 386 U.S. 171, 190 (1967); *D'Orazio v. McGraw Edison Power Sys. Div.*, 802 F. Supp. 1297, 1302 (W.D. Pa. 1992). Thus, the plaintiff must prove that the employer breached the collective bargaining agreement to prevail on the breach of duty of fair representation claim against the union, and vice versa. *Felice v. Sever*, 985 F.2d 1221, 1226 (3d Cir. 1993); see also *United Parcel Serv., Inc. v. Mitchell,* 451 U.S. 56, 66-67 (1981); *DelCostello v. Int'l Bhd. of Teamsters,* 462 U.S. 151, 164-65 (1983).

A union has the duty to represent all members of the bargaining unit fairly. See *Humphrey v. Moore*, 375 U.S. 335, 342 (1964); *Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 563 (1990) ("The duty requires a union 'to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.'"). This duty of fair representation affords individual employees a certain degree of protection against discriminatory treatment by a union and is a counterbalance to the union's position as exclusive bargaining representative. *Steele v. Louisville & Nashville R.R.*, 323 U.S. 192, 202-03 (1944); *Masy v. New Jersey Transit Rail Operations, Inc.*, 790 F.2d 322, 327-28 (3d Cir. 1986); see also *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 564 (1976); *Riley v. Letter Carriers Local No. 380*, 668 F.2d 224, 228 (3d Cir. 1981). This duty requires a union to provide its members with fair representation in resolving differences with employers. *Findley v. Jones Motor Freight, Div. Allegheny Corp.*, 639 F.2d 953, 955 (3d Cir. 1981). Because the scope of the duty of fair representation is commensurate with the scope of the union's statutory authority as the exclusive bargaining

11

agent, a member of the bargaining unit has a cause of action against the union in the event of a breach of that duty. *Bensel v. Allied Pilots Ass'n*, 387 F.3d 298, 312 (3d Cir. 2004); see also *Vaca*, 386 U.S. at 186.

However, because a union must attempt to satisfy the collective needs of a group of employees, a union has a certain amount of discretion. *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338 (1953); *Masy*, 790 F.2d at 327-28. Therefore, "[a] breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Vaca*, 386 U.S. at 190; see also *Riley*, 668 F.2d at 228. Likewise, a union's actions are arbitrary for purposes of a breach of the duty of fair representation "only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness,' . . . as to be irrational." *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991) (citing *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338 (1953)).

A union is not required to take every grievance to arbitration in order to fulfill its duty. See *Vaca*, 386 U.S. at 191 (noting that, while a union may not arbitrarily ignore a meritorious grievance or process it in a perfunctory fashion, an employee does not have an absolute right to have his grievance taken to arbitration). Rather, a union is obligated to exercise its power as bargaining agent fairly under the collective bargaining agreement and must not assert or press grievances that it believes in good faith do not warrant such action. *Bazarte v. United Transp. Union*, 429 F.2d 868, 872 (3d Cir. 1970). Accordingly, an employee is subject to the union's discretionary power to settle or even to abandon a grievance, so long as it does not act arbitrarily, even if the employee's claim was meritorious. *See id.* (noting that a plaintiff must prove arbitrary or bad-faith conduct on the part of the union in processing a grievance). Thus, proof

that a union acted negligently or exercised poor judgment is not enough to support a claim that a union breached its duty of fair representation. *Bazarte v. United Transp. Union*, 429 F.2d 868, 872 (3d Cir. 1970); *D'Orazio v. McGraw Edison Power Sys. Div.*, 802 F. Supp. 1297, 1305 (W.D. Pa. 1992) ("[P]roof that the Union may have acted negligently or exercised poor judgment is not enough to support a claim of unfair representation.").

## V. DISCUSSION

Plaintiffs filed a hybrid claim under the Railway Labor Act, 45 U.S.C. § 151 *et seq.* against CSXT, BLET, and GCA. (See Doc. No. 39 at ¶ 52). To prevail on this claim, Plaintiffs must prove both (1) that their employer, CSXT, violated the collective bargaining agreement and (2) that the union, BLET and GCA, breached the duty of fair representation. See *Vaca v. Sipes*, 386 U.S. 171, 190 (1967); *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 165 (1983); *D'Orazio v. McGraw Edison Power Sys. Div.*, 802 F. Supp. 1297, 1302 (W.D. Pa. 1992). Because the Plaintiffs must prove that the union breached its duty of fair representation to prevail on their claim for back pay against CSXT, the Court will first address Plaintiffs' claims against BLET and GCA.

It is helpful to summarize at the outset Plaintiffs' claims against CSXT. According to Plaintiffs, CSXT breached Article 67.C of the SSA, the collective bargaining agreement that is binding on the parties. Plaintiffs contend that due to this breach, CSXT paid them at a rate of pay much lower than the rate required under the SSA. Plaintiffs assert that the proper rate of pay under the SSA is 125 miles per day (the "higher rate"), while CSXT paid the Plaintiffs at a rate of only 100 miles per day (the "lower rate"). This alleged breach produced two separate, but related, issues: (1) correcting the rate at which the Plaintiffs were paid ("pay rate issue"), and (2) reimbursing the Plaintiffs with the back pay that resulted from CSXT's wage compensation at

the lower rate of pay ("back pay issue"). CSXT began paying Plaintiffs at the higher rate—the rate consistent with Plaintiffs interpretation of the SSA—in April 2010, thus resolving the pay rate issue. Pursuant to the Settlement Agreement, CSXT paid Plaintiffs a back pay amount for the period of January 1, 2009, through April 2010. Accordingly, the gravamen of Plaintiffs' claim is that CSXT owes them the amount of back pay due during the period from April 25, 2007, when the SSA became effective, until January 1, 2009. With this summary of the Plaintiffs' back pay claim in mind, the Court turns to Plaintiffs' claim that the union breached its duty of fair representation.

## A. BLET's and GCA's Breach of the Duty of Fair Representation

BLET argues that it is entitled to summary judgment because Plaintiffs have failed to show that BLET owed Plaintiffs a duty of fair representation. (Doc. No. 68 at 9). BLET asserts that it was not involved in the helper pay dispute and played no role in the settlement agreement negotiated by GCA, and therefore could not have breached a duty of fair representation in connection with the settlement. (Doc. No. 68 at 10). BLET contends that GCA did not act as an agent of BLET; that BLET did not direct or control GCA's actions in settling the back pay dispute with CSXT; and that only GCA owed a duty of fair representation to Plaintiffs in the matter, not BLET. (See Doc. 68 at 10-13). Furthermore, GCA, not BLET, negotiated the SSA with CSXT, and GCA is responsible for administering the collective bargaining agreement between CSXT and Plaintiffs. (Doc. No. 70 at 15). Both BLET and GCA point to their respective governing documents for support that they are distinct entities. (See Doc. Nos. 68 at 2; 70 at ¶¶ 4-14; 63 at ¶¶ 2-6; 67-2 at 50; 67-3 at 1-3).

The Court agrees that Plaintiffs' evidence fails to establish the necessary agency link between BLET and GCA to support a finding that BLET is responsible for GCA's actions,

14

including any violation of the duty of fair representation in connection with the helper pay dispute and settlement agreement at issue here. See *Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1288-92 (3d Cir. 1991); *Carbon Fuel v. Mine Workers*, 444 U.S. 212, 216-17 (1979); *Scott v. Graphic Communications Int'l Union, Local 97-B*, 92 F. App'x 896, 904-05 (3d Cir. 2004). Likewise, Plaintiffs have produced no evidence that BLET, or any person directly employed by BLET, was involved in the back pay dispute or settlement of Plaintiffs' claims. Nevertheless, this issue is rendered moot based on the Court's conclusion below that Plaintiffs have failed to show that the union violated its duty of fair representation.

Accordingly, construing the evidence in a light most favorable to the Plaintiffs, the Court will accept as true, for the sole purpose of resolving the instant motions, Plaintiffs' allegations that BLET and GCA are one entity for the claim that the union breached its duty of fair representation. The Court will thus refer to BLET and GCA collectively as "the union."

Plaintiffs assert that the union breached its duty of fair representation in two ways. First, Plaintiffs contend that the union refused to "perform a ministerial act" on behalf of the Plaintiffs, namely to collect back pay. (Doc. No. 59 at 2, 10-13). Second, Plaintiffs contend that the union arbitrarily executed a settlement agreement with CSXT that "resulted in unequal, discriminatory, disparate, irrational and arbitrary treatment" of Plaintiffs. (Doc. No. 59 at 2-3, 13-15).

### 1. The Union's Refusal to Perform a Ministerial Act

Plaintiffs assert that the union refused to "perform a ministerial act" on their behalf. (Doc. No. 59 at 2). Essentially, Plaintiffs argue that the union improperly handled the Plaintiffs' back pay claims when CSXT violated the SSA. According to Plaintiffs, the union failed to collect the back pay owed by CSXT, and the union wrongly informed Plaintiffs that the back pay

15

issue was an administrative payroll error that CSXT would correct and, as a result, improperly advised Plaintiffs not to file claims or grievances. (Doc. No. 59 at 2-3, 10).

### a. The Union Failed to Collect the Full Amount of Back Pay

Plaintiffs assert that the union breached its duty because it settled the helper pay dispute with CSXT for less than the full amount of back pay. (Doc. 59 at 2). Plaintiffs contend that the union conceded over $200,000 of additional back pay owed to Plaintiffs. (Doc. No. 59 at 9). Plaintiffs argue that this concession—coupled with the fact that CSXT initially identified the helper pay dispute as a payroll profiling or coding error (Doc. No. 59 at 9, 12) and that Finamore stated that CSXT's position was "frivolous" (Doc. No. 59 at 13)—demonstrates that the union breached its duty of fair representation by failing to collect the full amount of back pay. (Doc. No. 59 at 14).

Contrary to Plaintiffs' arguments, the union did not violate its duty of fair representation when it agreed to settle the back pay dispute for less than the full amount. A union has a duty to provide fair representation in the negotiation, administration, and enforcement of the collective bargaining agreement. *Vaca v. Sipes*, 386 U.S. 171, 190-94 (1967). A union breaches that duty only when the union's conduct is arbitrary, discriminatory, or in bad faith. *Id.* at 190. "In administering the grievance and arbitration machinery as statutory agent of the employees, a union must, in good faith and in a nonarbitrary manner, make decisions as to the merits of particular grievances." *Id.* at 194. An employee is subject to the union's discretionary power to settle or even to abandon a grievance, so long as it does not act arbitrarily, even if the employee's claim was meritorious. See, e.g., *Bazarte v. United Transp. Union*, 429 F.2d 868, 872 (3d Cir. 1970).

Here, Finamore articulated cogent reasons for his decision to settle the claims for a lesser amount rather than arbitrate the dispute in an attempt to collect the full amount owed. (Doc. No. 67-2 at 42). As will be more fully discussed in the section below, GCA entered the settlement agreement with CSXT to achieve the most amount of money possible for its members while averting the risk of losing everything at arbitration. Finamore testified in his deposition

> [GCA] just felt that in the best interest of these members here, rather than run the risk of losing the whole entire rule for 6,000 engineers, it was best to settle the claim. . . . The members got the money without the benefit of a claim. If they go to an arbitration, . . . [w]e run the risk of losing the entire rule. . . . [W]hat we gain[ed] was $134,000 for the members.

(Doc. 67-2 at 42 and 45). Plaintiffs have not produced sufficient evidence from which a reasonable jury could conclude that the union's decision to settle the helper pay dispute for less than the full amount was arbitrary, discriminatory, or made in bad faith.

### b. The Union Wrongly Informed Plaintiffs the Helper Pay Issue was an Administrative Payroll Error and Improperly Advised the Plaintiffs Not to File Claims

Plaintiffs maintain that the union wrongly informed them that the helper pay discrepancy was an administrative payroll error that CSXT would correct. (Doc. No. 59 at 3, 10-12). Both GCA and CSXT concede that, when Plaintiffs first raised the helper pay issue, the union and CSXT believed the problem was an administrative payroll issue. (Doc. No. 65 at ¶ 15-17; Doc. No. 66 at 5). However, once CSXT fully investigated the matter, it concluded that the pay rate discrepancy resulted from Plaintiffs' incorrect interpretation of the "division home terminal" language in the collective bargaining agreement. (Doc. No. 66 at 6; Doc. No. 67-2 at 18, 38-39, 42; Doc. No. 67-5 at 14-16). Thereafter, CSXT treated the matter as a contract dispute over the interpretation of Article 67 of the SSA, rather than as a payroll profiling or coding error. (See Doc. No. 66 at 14).

Plaintiffs have not shown that the union breached its duty when it informed Plaintiffs that the helper pay issue was an administrative payroll error that CSXT would correct. Plaintiffs must show that the union's conduct was arbitrary, discriminatory, or in bad faith. *Vaca,* 386 U.S. at 190; *Riley,* 668 F.2d at 228. Plaintiffs' evidence simply does not support such a showing. Both the union and CSXT initially believed that the helper pay issue was an administrative payroll error, and it was not until later that CSXT concluded that the issue was a contract interpretation issue. Furthermore, once CSXT informed the union that the helper pay issue was a disputed contract issue and not a payroll issue, the union articulated its position concerning the meaning of the disputed contract terms and attempted to negotiate the best possible outcome for its members. The union's conduct was not arbitrary, discriminatory, or in bad faith.

Plaintiffs further contend that the union improperly advised Plaintiffs not to file any claims regarding the helper pay dispute. (Doc. No. 59 at 10). Plaintiffs assert that the union agreed to settle the Plaintiffs' back pay claims for less than the full amount, in part, because no claims had been filed, even though the union had previously advised Plaintiffs not to file the claims. (Doc. No. 59 at 10-11).

The SSA provides a process for employees to file claims related to pay discrepancies. (See Doc. No. 67-2 at 14). Pursuant to the SSA, an employee must file a claim challenging the accuracy of his pay within 60 days. (See Doc. No. 67-2 at 14).

The union denies Plaintiffs' assertion that the union advised Plaintiffs not to file claims concerning the helper pay issue. (See Doc. Nos. 58 at ¶ 5; 78 at ¶ 5; 80 at ¶ 5; 82 at ¶ 5). Further, Plaintiffs concede that, in labor relations meetings between CSXT and the union, it was CSXT—not the union—who indicated that the helper pay issue would be "investigated and corrected" and that "there was no need to file claims." (Doc. No. 58 at ¶ 6; see also Doc. Nos. 78

18

at ¶ 6, 80 at ¶ 6, 82 at ¶ 6). These observations are consistent with Finamore's deposition testimony. Finamore stated that he "never instructed anybody never to file a claim." (Doc. No. 67-2 at 14-17; Doc. No. 67-2 at 15). However, according to Finamore, at a payroll meeting between members of GCA and CSXT in 2010, CSXT informed GCA that local claims did not need to be filed in the helper pay dispute. *Id.* Nevertheless, construing the evidence in the light most favorable to Plaintiffs, the Court will accept as true Plaintiffs' contention that the union advised its members not to file claims concerning the helper pay issue. (Doc. No. 58 at ¶ 5).

Even accepting Plaintiffs' allegations as true that the union advised Plaintiffs not to file claims, Plaintiffs have produced no evidence that the union's advice to its members was made in bad faith or that the union's actions were in any way arbitrary or discriminatory. See *Medlin v. Boeing Vertol Co.*, 620 F.2d 957, 961 (3d Cir. 1980) ("[I]t is essential that plaintiffs allege a bad faith motive on the part of the union."); *Bazarte v. United Transp. Union*, 429 F.2d 868, 872 (3d Cir. 1970) ("[P]roof that the union may have acted negligently or exercised poor judgment is not enough to support a claim of unfair representation."); *D'Orazio v. McGraw Edison Power Sys. Div.*, 802 F. Supp. 1297, 1305 (W.D. Pa. 1992). Rather, the evidence shows that the union zealously pursued resolution of Plaintiffs' claims in a manner most favorable to them. (Doc. No. 63 ¶¶ 11-22; Doc. No. 75 ¶ 11-22).[12]

Notably, the union negotiated a favorable settlement for Plaintiffs—albeit not for the full amount of back pay—despite the fact that no employee had filed a single claim. As Finamore noted in his deposition, "The members got the money [$134,000 in back pay] without the benefit of a claim." (Doc. No. 67-2 at 45). Moreover, although Finamore disagreed with CSXT's interpretation of the SSA, he concluded that it was in the best interest of all of GCA's members,

---

[12] Plaintiffs concede in their CSMF that "Finamore and Knorek discussed the pay rate discrepancy during numerous labor relations meetings with CSX." (Doc. No. 58 at ¶ 6; see also Doc. Nos. 78 at ¶ 6, 80 at ¶ 6, 82 at ¶ 6).

19

not just Plaintiff's interests, to resolve the dispute without proceeding to arbitration. (See Doc. No. 67-2 at 42). Similarly, CSXT began compensating Plaintiffs at the higher rate under the SSA, which Plaintiffs would have risked losing had the matter been arbitrated.

Thus, contrary to Plaintiffs' arguments, the record is replete with evidence that the union avidly pursued a reasonable resolution of the Plaintiffs' claims against CSXT in a rational and fair manner favorable to the Plaintiffs. Plaintiffs have not produced sufficient evidence that the union performed its handling of Plaintiffs' helper pay claims in a manner that was arbitrary, discriminatory, or in bad faith from which a reasonable jury could find for the Plaintiffs.

## 2. The Union's Execution of the Settlement Agreement

Plaintiffs assert that the settlement agreement resulted in the "unequal, discriminatory, disparate, irrational, and arbitrary treatment" of the Plaintiffs regarding the back pay to which each Plaintiff was entitled. (Doc. 59 at 9). Essentially, Plaintiffs are dissatisfied with the amount of back pay that they received under the settlement agreement.

To support their claim that the union violated its duty of fair representation in entering the settlement agreement, Plaintiffs offer the following evidence: (1) the Byers' email indicated that the pay rate discrepancy was a CSXT payroll error; (2) shortly after the Byers' email, CSXT began paying workers at the higher rate of 125 miles per day; (3) Macedonio, CSXT's HDO, asked in an email whether CSXT was at fault for the pay rate problem; (4) Finamore stated in an email that CSXT's position concerning the amount of back pay was "totally unacceptable"; and (5) Finamore believed Macedonio's interpretation of Article 67.C of the SSA was "frivolous" and motivated by a desire to pay less than the total claim. (See Doc. No. 59 at 11-14). According to Plaintiffs, this evidence shows that Finamore executed a settlement agreement, which ceded a significant amount of Plaintiffs' back pay, despite CSXT's own concession that

20

the helper pay issue was an administrative payroll error and despite Finamore's belief that CSXT's position was unacceptable and frivolous. (See *Id.*).

An employee is subject to a union's discretionary power to settle or even abandon a grievance so long as it does not act arbitrarily. *Bazarte v. United Transp. Union*, 429 F.2d 868, 872 (3d Cir. 1970); *Findley v. Jones Motor Freight*, 639 F.2d 953, 957-58 (3d Cir. 1981). The standard for determining whether a union breached its duty of fair representation is whether the union entered a settlement in a manner that was arbitrary, discriminatory, or in bad faith. *Vaca v. Sipes*, 386 U.S. 171, 177, 190 (1967). Thus, the union's conduct is the relevant focus of the inquiry, not merely the amount of the settlement. *Id.* While a union is obligated to exercise its powers fairly and not in an arbitrary manner, an employee does not have an absolute right to have his grievance arbitrated. See *Vaca*, 386 U.S. at 194-96 (noting that an employee does not have an absolute right to have his grievance arbitrated and that proof of a meritorious grievance does not automatically establish a breach of the duty of fair representation); *Findley*, 639 F.2d at 957-58.

Contrary to Plaintiffs' assertion, the union did not enter the settlement agreement as the result of any arbitrary, discriminatory, or bad faith motives. The union based its decision on dual concerns of (1) the "uncertainty of arbitration over a contract interpretation issue" and (2) "the risk of losing the [higher rate of pay] for all affected employees covered by the contract." (See Doc. No. 83 at 3). Throughout the grievance process, the union believed that the Plaintiffs were entitled to full back pay from April 2007, when the SSA became effective, through April 2010, when CSXT began paying at the higher 125 mile per day rate. (Doc. No. 67-2 at 12, 23). Nevertheless, keenly aware of the high stakes at issue, the union believed that proceeding to arbitration without a claim would have been "suicide" and that "in the best interest of

[Plaintiffs], rather than run the risk of losing the whole entire rule for 6,000 engineers, it was best to settle the claim." (Doc. No. 60-7 at 19). Finamore stated in his deposition that he believed CSXT was "trying to get out of paying anything, period" and that CSXT was using the "division home terminal" clause in the SSA to leverage a favorable outcome for CSXT at arbitration. (Doc. No. 67-2 at 19-20). Based on his understanding of CSXT's position and based on the likelihood of success in arbitration, Finamore believed the settlement was the best option for the members. (Doc. No. 67-2 at 40-45).

Nothing about the union's settlement agreement with CSXT appears to be discriminatory, arbitrary, unreasonable, or in bad faith. To the contrary, in light of the factual and legal landscape at the time of the union's actions, the union's settlement with CSXT concerning Plaintiffs back pay claim falls squarely within the applicable range of reasonableness, and thus, the union's actions were not arbitrary for purposes of a breach of the duty of fair representation. See *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991). The union agreed to the settlement based on its reasonable belief that, if Plaintiffs arbitrated the dispute, they could lose all of the back pay and would risk a wage reduction from the higher rate of pay to the lower rate of pay—not only for Plaintiffs but also for numerous other affected employees. See *Findley v. Jones Motor Freight*, 639 F.2d 953 (3d Cir. 1981) (identifying the relevant inquiry as whether the union's representation in the grievance proceedings was within the "range of acceptable performance" and noting in "processing grievances there are times when the interests of all the employees effected by given circumstances may not be harmonious" such that "a union may be placed in a position where securing benefits for one group works to the detriment of other members"). Accordingly, the Plaintiffs have not produced sufficient evidence from which a reasonable jury could find that the union violated its duty of fair representation.

22

## B. CSXT's Violation of the Collective Bargaining Agreement

Plaintiffs contend that CSXT violated the applicable collective bargaining agreement. (Doc. No. 59 at 16). Specifically, Plaintiffs claim that CSXT breached Article 67.C of the SSA by withholding back pay from April 2007 until April 2010.

In a hybrid claim, a plaintiff must demonstrate that he did not receive fair representation from the union in addition to proving his claim against the employer. See *Findley v. Jones Motor Freight, Div. Allegheny Corp.*, 639 F.2d 953, 957-58 (3d Cir. 1981). A plaintiff must establish both of these elements before he is entitled to relief. *Id.* Thus, while a plaintiff's claim against his employer may be meritorious, he nevertheless cannot prevail in a federal court action unless he establishes a lack of fair representation. *Id.*; see also *Vaca*, 386 U.S. at 171.

Here, because Plaintiffs have filed a hybrid claim and because Plaintiffs have failed to prove the union violated its duty of fair representation, Plaintiffs' claim against CSXT for its alleged violation of the collective bargaining agreement also fails. See *Felice v. Sever*, 985 F.2d 1221, 1226 (3d Cir. 1993); *United Parcel Serv., Inc. v. Mitchell*, 451 U.S. 56, 66-67 (1981); *DelCostello v. Intl. Bhd. of Teamsters*, 462 U.S. 151, 164-65 (1983).

## VI. CONCLUSION

For the forgoing reasons, the Court finds that Plaintiffs have failed to set forth sufficient evidence to establish that BLET and GCA breached the duty of fair representation. Accordingly, the Court will **DENY** Plaintiffs' motion for summary judgment and will **GRANT** summary judgment for Defendants CSXT, BLET, and GCA. An appropriate order follows.

23

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOE J. ABRAMOWICH, JR., JAMES F. )
CHEEK, GEORGE FRIEDLINE, RALPH )
E. HOUGH, HAROLD R. LEONARD, )
JIM B. MANGES, TERRY W. )
MARCHEWKA, PAT RUCK, FRANKLIN )
RANDALL SHELKEY, MARK R. WARD, )
and NATHAN WESTFALL, ) CIVIL ACTION NO. 3:11-109
)
        Plaintiffs, ) JUDGE KIM R. GIBSON
)
        v. )
)
CSX TRANSPORTATION, INC., )
BROTHERHOOD OF LOCOMOTIVE )
ENGINEERS AND TRAINMEN, and )
THE BROTHERHOOD OF LOCOMOTIVE )
ENGINEERS AND TRAINMEN, GENERAL )
COMMITTEE OF ADJUSTMENT CSX )
TRANSPORTATION NORTHERN LINES, )
)
        Defendants. )

## ORDER

**AND NOW**, this 26th day of September, 2013, in accordance with the foregoing Memorandum, **IT IS HEREBY ORDERED** that Plaintiffs' Motion for Summary Judgment (Doc. No. 57) is **DENIED**, Defendant CSX Transportation, Inc.'s Motion for Summary Judgment (Doc. No. 62) is **GRANTED**, Defendant Brotherhood of Locomotive Engineers and Trainmen's Motion for Summary Judgment (Doc. No. 61) is **GRANTED**, and Defendant The Brotherhood of Locomotive Engineers and Trainmen, General Committee of Adjustment CSX Transportation Northern Line's Motion for Summary Judgment (Doc. No. 56) is **GRANTED**.

The Clerk shall enter judgment in favor of all Defendants against all Plaintiffs and then close the

case.

**BY THE COURT:**

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**

25